Mr. Shah, go ahead. May it please the Court. Prateek Shah for Appellant VIZIO, Inc. Under Connecticut's novel regulatory program, which imposes in-state recycling fees based on national market share, that is, how many televisions a manufacturer sells nationwide, a dominant interstate manufacturer that sells just one television inside Connecticut would have to shoulder the lion's share of the costs for Connecticut's recycling program. The Commerce Clause precludes Connecticut from shifting costs to out-of-state manufacturers in that patently disproportionate manner. Now, to be sure, Connecticut is free to impose e-waste costs on manufacturers, but it must do so without reaching out-of-state sales beyond its borders, just as other states have done, including Connecticut, with respect to every other type of covered electronic product. There are a number of alternatives. It could use state market share, advance recovery fees, take-back programs, return share calculations. And although Connecticut's program presents an issue of first impression, it implicates the same economic balkanization concerns that motivated the framers to design the Commerce Clause to protect against. That is, as the District Court observed, the only way for an interstate manufacturer like VIZIO to avoid Connecticut's unfair regulation is to keep its products out of Connecticut altogether. I think that it's not controlling conduct in other states. I mean, I can understand your argument that in some circumstances it could be affecting price, but it's not setting price. You're right, Your Honor. We're not making a price control argument here. This is different than the facts in Healy. The argument that we're making and what Healy recognizes as a separate category of impermissible extraterritorial conduct is when a state directly applies its regulation to out-of-state commerce. That's the prong that we're relying on. So it's separate and apart from when you have facial discrimination, separate and apart from when you have direct price control. If a state is directly applying its regulation to out-of-state commerce, it triggers this. And there's two ways in which Connecticut here is directly applying its e-waste law to out-of-state sales. One, it's doing it most obviously to calculate their in-state recycling obligation. It's looking to out-of-state sales to do that. But two, beyond that, for manufacturers like Vizio, whose national market share exceeds its state market share, it's levying a charge for every single sale that Vizio makes outside of Connecticut. So for every television that Vizio sells in California, it is paying a small fee to Connecticut to fund its recycling program. That is direct regulation of an out-of-state sale. And that is the undeniable impact of the state's regulation on manufacturers like Vizio, whose national market share exceeds its state market share. There are a couple cases that I would point to. Now, the state contends that extraterritoriality cannot extend beyond the direct price control or other direct control circumstances. I'd point this court to the recent en banc decision from the Ninth Circuit in San Francisco. Not a direct control case, but there, California had a regulation attaching a fee to completely out-of-state sales of artwork in which it routed a small portion of the sale price to the artist. And the Ninth Circuit said, we can, quote, easily conclude that that's extraterritorial. It didn't control the sale, it didn't prevent the sale, but it said, we're going to add a commission that you have to pay. And arguably, that had a greater state connection than this one, because at least the person paying that fee had to be a California resident. The other context that I would point you to in terms of our extraterritoriality argument is, and we know this is not a tax case, but I think an analogy works here. Just like Connecticut is levying a charge on every out-of-state sale that Vizio makes, in the tax context, it's well established that a state cannot tax a purely out-of-state transaction that doesn't have some connection to the state itself. For example, Connecticut could not impose a sales tax on that same California sale. And the idea is, a manufacturer shouldn't be subject to a double levy. Well, by changing the label from a tax to a regulatory fee, it shouldn't be able to accomplish the same objective. That is, it's a commerce clause problem for a single manufacturer to be subject to a double levy from two different states. California can legitimately impose a regulatory fee to recycle the television sold in California, but for that same sale in California, Vizio has to pay a fee to Connecticut. That is impermissible. Now, perhaps you can help us by describing the context of this legislation. How many other corporations fall in the same category as you do? Your Honor, this was dismissed at the 12B6 motion dismiss stage, so we just don't know that. What we do know, and Vizio has done its own research into its sales data, is it can say that it has estimated 25 to 50 percent greater national market share to state market share. I'm not sure which other manufacturers fall into that same boat. Now, the state does say, and I think this is their primary argument, that, look, this is just a proxy. We're just using national market share as a proxy for state market share. But the problem is, they've made no showing at all that that proxy is remotely a reasonable one, and we have contrary allegations in our complaint at the 12B6 stage that it's not remotely a fair proxy with respect to manufacturers like Vizio. That should not come as a surprise. Vizio has zero distribution centers in Connecticut. Its retailer footprint is smaller in Connecticut, and Connecticut, which has the highest per penny state, there's reasons to believe that Vizio's television, which is a low-cost producer, are going to sell less there. And here's what shows that this is not just a proxy. Even if it were undisputed that you had a manufacturer who had a 90 percent national market share, but only a 10 percent share in Connecticut, the state would still impose a 90 percent share of Connecticut's recycling fees. There is no discretion under the statute. There's no way Vizio can say, hey, look, look at our data, and we're way lopsided here. Fix this. So that belies the notion that this is a proxy. And that brings us to the second argument, which I realize I'm running out of time is, but the way, if you don't want to look at this as an extraterritoriality case, then I think you have to look at this as a user fee case, because the way that one tests those proxies to see if they're actually a fair approximation, because states can impose on interstate commerce. There is a test for that. The Supreme Court has set it up in Evansville. State does not deny that on the merits that district court would have to be reversed if Evansville applied at the 12B6 stage. The only argument that the state makes in front of this court is that the user fee framework does not apply at all. It rests on two sentences. What's wrong with that argument? Well, here's what's wrong with that argument. And I acknowledge footnote six of Oregon Waste, which acknowledged there that a private landfill owner couldn't appeal. I'd say two responses to that. First, that is clearly dictum in that footnote. That is, regardless of whether you treated that as a user fee in Oregon Waste, it made absolutely no difference to the outcome. That regulation was struck down as facially discriminatory under the Commerce Clause, and the Supreme Court said it in that footnote. So you could have taken that footnote out, no difference to the outcome. That program still failed. It's dictum. And as this court has said, and Judge LaValle has written extensively, Supreme Court dictum is not binding on this court. This court then has to see, on the merits, does it make sense? And I submit, and the state still hasn't offered an explanation of why that dictum makes any sense at all. A state sets up a regulatory program. The only difference is, the last step of the program, who does the recycling, whether it's a private recycler or a state personnel who do the recycling, cannot be a reasoned explanation for why you disregard the user fee test, the test that the Supreme Court has set up to determine whether you are imposing a fair share on interstate markets. So without any, because it's dictum, there has to be some, at least, defensible basis to use that dictum as a basis for excluding that test. We have not seen one in the papers, nor can I fathom one, that you could have the exact same program, but without contracting out that last step, suddenly you evade constitutional scrutiny. It simply doesn't make sense. Your adversary argues that the plaintiff, that you haven't alleged any facts to show that the law burdens interstate commerce as opposed to your client's bottom line. So could you give me like the, how does this burden interstate commerce? Sure. So the first thing I'd point out is the extraterritoriality and the user fee tests already incorporate that. So you apply those tests and you get it. But to answer your question directly, I think the most direct burden is that the E-Way law benefits those manufacturers that sell a disproportionately higher share of televisions inside Connecticut, and it does it at the expense of those manufacturers that sell a disproportionately higher share outside of Connecticut. That is a burden on interstate commerce, and I would say it has two consequences. Can you explain how you think this scheme would work? And I'm just trying to understand the scheme. If it were, if every state adopted it. Sure. If every state had a national market share. Used it as a proxy for their end state. Right. I think that would ameliorate the problem, right? If every state had a national market share, it wouldn't be perfect because national market share is measured in different ways, people use different data sets and all, but if they all agreed on the same data set, they all use that, it would certainly ameliorate the problem. There's a volume difference in each state, so it still wouldn't be perfect, right? If you have California applying the same percentage to a much higher volume than Connecticut applying it to a lower volume, it still doesn't work out as a wash, but it would certainly ameliorate the problem. But the reality is that only a small number of states use, require the use of national market share like Connecticut. Other states that have these regulatory programs have a variety of different methods that don't even require using market share at all. Do you know how many other states use the approach Connecticut has taken? Your Honor, the state has a footnote of a handful of states, I think a half dozen states, but not all of those require use of national market share. I think there's only three by my count that actually require. Some of those states that have national market share at least give the manufacturer an option to show its state market share data, and will consider it Connecticut, like Maine, and I think one other state doesn't even allow that option. Let me ask you mechanically, or in terms of your representation of this client, how does one actually determine national market share? So national market share, what the state uses, and counsel for the state can probably speak to this even more precisely, but my understanding is that the state essentially uses a third party contractor who, a third party service that gets national market share data, and my understanding is that that third party service gets it in part from retailer data and in part from manufacturers, and comes up with a number on national market share, and then Connecticut pays that contractor for that data, and allocates national market share based on that data, and what I would point out is, you know, the state says it simply doesn't have state market share data, well there's an easy way to solve that problem, which is have retailers report how many television brands they sell, retailers have that data, and that could easily be done. Now since both of you, both counsel here, constitute possibly the world's leading authorities on this subject, maybe we can get the benefit of your wisdom, both of you. Do we know of other cases in which a so-called user fee analysis is applied to fees for facilities in which the government did not have some sort of proprietary interest? Your Honor, I guess what I'd point you to, this is what I would say, this is the first I mean, this is unusual, right? This is unusual, this is the first case that's ever cited the Oregon footnote 6 dictum that we could find, the district court decision in this case. This is the only case to rely on that public-private distinction. The other thing I would say, Judge Cabran, is in an opinion that you wrote called USA Recycling, which we cite in our brief, that wasn't exactly on all fours One of the garbage cases It was one of the garbage cases It was a leading authority on garbage Yes For a long time Yes For a long time Yes. So in that case, it was the town that collected the fee, but they contracted out the actual garbage disposal to a private entity. And so, you know, that is some evidence we think that this court, post-Oregon waste, has recognized that the contracting out a program to a private entity doesn't mean user fee analysis. Now, user fee analysis wasn't the centerpiece of that case, but the court did discuss the, apply the user fee framework and rejected it on the merits, because unlike here, the user fee in that case was perfectly proportional. So there was no problem there. But, Your Honor, there isn't much law on that. Great. Well, this is very helpful. Thank you very much. Thank you, Your Honor. And we'll hear from the other expert in these matters. Good morning, Your Honors. May it please the Court, I'm Assistant Attorney General Michael Skold and I represent the defendant in this appeal. Your Honors, the plaintiff fundamentally misunderstands both the purpose and the scope of the Dormant Commerce Clause. The Supreme Court has been very clear that the clause does not put, elevate free trade above all other values. It does not displace the state's ability to regulate in the public interest, in the interest of public health and safety. And most importantly for this case, it does not exist to ensure parity and fairness between manufacturers in a particular industry. What it exists to protect is the interstate market itself. And so, to invoke the clause under any theory, plaintiff must demonstrate that the law, not that it burdens plaintiff in its own bottom line, but that the law's reliance on national sales data actually impedes the interstate market. And that just doesn't exist here, Your Honors. And this is a crucial point because it really informs the analysis under all of the theories that we're talking about. We can talk until we're blue in the face about how the law looks at national sales data and how that impacts this manufacturer or that manufacturer. But at the end of the day, none of that matters unless it actually impedes the market. And here, there is no impediment. They've abandoned their discrimination claim. They've abandoned any claim that the law directly controls conduct. There is no allegation anywhere in the complaint that the law's reliance on national sales data in any way restricts the flow of televisions into and out of Connecticut. And there is no allegation that the law in any way changes plaintiff's or any other manufacturer's business practices in Connecticut or in any other state. There is no burden on the market itself. All that we have is an alleged burden on particular manufacturers whose national market share exceeds their Connecticut market share. And they're claiming they have to incur higher costs in Connecticut than manufacturers who have a higher Connecticut market share than they have a national market share. That is a burden on particular firms. It is not a burden on interstate commerce. So I think that that is the focal point that really underlies this entire case. And turning to the particular theories that the plaintiff has invoked, I want to focus on the extraterritoriality and the user fee claims. With regard to extraterritoriality, Your Honors, every single court that has applied that doctrine, the Supreme Court, this Court, and every other circuit court, including in the San Francisco case, held that to invoke the extraterritoriality doctrine, the law at issue must directly control conduct. That's true in the Price context, in the Healy and Brown-Foreman cases where the Supreme Court expressly held that the critical inquiry is, quote, whether the law, quote, controls conduct beyond the borders of the state. That's Healy at page 336. And it's true in And why is that not the case here? Because the law's reliance on national sales data does not in any way control any sort of conduct. Plaintiff is free to price its products, to sell its products, to distribute its products, however it wants, anywhere in the country. The law doesn't say anything about that. All that it does is impose costs for televisions that are recycled in Connecticut. It does, it approximates Connecticut market share by looking to those information about those national sales. And why, let me ask, I mean, this is a very naive question, I recognize. Why, why is national data relevant? Why do you find that, as a policy matter, an appropriate measure in these circumstances? Because the state does not, the statute on its face looks to Connecticut market share, but we don't have Connecticut data. And so the law is looking to national data as a proxy. If you could get it as a matter of policy, in theory, you would just rely on Connecticut data? I, I, that would be one option for the state to do. Certainly, if they had the Connecticut data, the legislature could do that. Um, but just because, even if they had the Connecticut data, Your Honor, I want to be very, very clear, that just because they look at national data, in and of itself, does not have any relevance at all. You have... That may be, and I'm interested in the argument, but let me ask you, is there any other regulatory scheme of this sort in any other state? Other states do use national market share data. There are several that we've cited in our brief. Are you talking about other industries? Yes. And also the, the e-waste, um, world. I'm, I'm not entirely sure of it. How distinctive or unique, if at all, is the Connecticut statute? It's not that unique, certainly within the e-waste context, Your Honor. We have a footnote in our brief that lists several other states, and it's more than three. It's, I think, twelve or some that either rely in whole or in part on national market share data. And it goes beyond the record, but I, my understanding is that even some states that look by statute to state data end up relying on national data, at least in some part. Um, so it, it, Connecticut is not unique in that sense. Um, and again, I want to get back to the point that just because it looks to national sales data by itself is, is not relevant at all. You have to look at how that impacts interstate commerce. And that's what the Court did in Healy and Brown. If the simple fact that the law looks to or incorporates out of, information about out-of-state conduct and incorporates that into the statute were per se unconstitutional by itself, then Healy and Brown, Brown-Forman would have been one-page decisions. Because in each of those cases, the law explicitly referenced out-of-state pricing decisions and expressly incorporated that into the in-state pricing scheme. But the, the Supreme Court didn't say that that by itself just automatically renders it unconstitutional. It went through a detailed analysis about how that reliance on the out-of-state conduct actually burdened commerce. And in particular, it held that the, the effect of the law was to control conduct, which is something that's in other states, that, which is something that states have no constitutional authority to do. And the upshot of that was the, the result of that control was that in those other states, there would be regulatory gridlock and inconsistent, too inconsistent pricing schemes within that single state that would make it impossible for sellers to conduct business. So that was a very specific . . . I have your, your footnote, footnote one on page seven. Has, have those statutes received any serious challenge like this one? Not to my knowledge, Your Honor, no. I, I do believe that this is a case in first impression as applied to this type of fact, but it's not a case of first impression as a legal matter. The legal framework is very clear. It has been uniformly applied in the exact same manner by every single court. And we don't fit legal theories to facts. Facts have to fit legal theories. And we don't just get to make up a new legal theory when our facts don't fit it within the ones that exist. And I think that, that Vizio itself knows that this is how the extraterritoriality doctrine works, because in the district court below, that's what they argued. They tried to argue a price control theory under Grand River and Freedom Holdings. It didn't work. They tried to argue a direct control under the American Booksellers v. Dean case. It didn't work. And so now, on appeal, they've completely abandoned those claims, and they're trying to make up a new extraterritorial, extraterritoriality doctrine that just has no grounding in any constitutional principle, especially when there's no, the law's reliance on that national data doesn't impede the market. One could imagine circumstances in which reliance on national data might impede the market. I mean, if you had a very, very strong, a high enough user fee and a very, very strong national player that was essentially with very small sales, it could lead that manufacturer to decide to pull out of Connecticut, I suppose. Absolutely. And that would not violate the Commerce Clause. The Exxon case, the IMS case from the First Circuit, they've been very clear. So it's your contention that that's the only, is that the only hypothetical effect on the market that you could imagine from a more disproportionate scheme than has been alleged? Yes. I mean, I don't, they certainly haven't alleged any burden on commerce. And the only burden that I can think of is, the only impact that this law has is it raises costs on some manufacturers compared to others. And so the only possible consequence that that could have that I can think of would be that that manufacturer might decide, look, it's just not worth us to do business in Connecticut. The costs are too high. We don't make enough money. We're going to withdraw from the market. And Exxon and the IMS case both make very clear that that is not a cognizable burden on interstate commerce. Presumably that market share will be picked up by a different manufacturer. Has Bolden entered a couple of orders? None of them, all of his actions are under 12B6. Is that right? That's correct, Your Honor. So there's never been any discovery? And you don't see any reason why there should be? No, Your Honor. There should not be any discovery. I mean, 12B6 requires them to plead facts to get beyond to state a claim under the elements that are required under the legal principles. And they just haven't pled any facts to support the elements under any of the theories. I'll be interested in hearing from Mr. Shaw on that later. Maybe it's altogether obvious. But whether, in his view, there are any material issues of fact that militate in favor of a remand for discovery or whether discovery would be useful to him in any way. Go ahead. Again, I would submit that there are no such facts. There's no control. There's no burden on commerce. And they haven't alleged any. And if I could just turn quickly to the user feed. The reason I raise it is it just seems to me that the very question of burden on commerce sounds like it resonates as a factual question. And certainly, courts have recognized in the Pike context that, yes, it is generally a factual question. But that doesn't obviate the need to plead facts to support that. And this Court has, on numerous occasions, affirmed dismissals under 12b-6 of Pike claims and a wide variety of other Commerce Clause claims. They have to allege what the burden is. And there's no burden on commerce. There's a burden on particular firms. And I see that my time is up. If I could just briefly address the user feed. Go ahead. There's really two reasons why the user feed claim fails. The first is that it's controlled squarely by the Oregon Waste and the Commonwealth Edison cases. And Oregon Waste, Your Honors, was not dicta. The Oregon Supreme Court, in that case, had expressly relied on the Evansville standard to declare the law unconstitutional. And on appeal, the Supreme Court specifically said, no, that was not the correct analysis. You do not analyze this kind of law under the user feed analysis. You use a different, the compensatory tax case theory. So it was not dicta. I don't know how you can argue that the rejection of the lower court's analysis can be dicta. And I think that that's confirmed by the fact that there is no case that in any way applies the user feed analysis to anything remotely like this. And the fact that the best case they can rely on is the Babylon case, I think, illustrates the weakness of this claim. That was a, they didn't cite that in any of the proceedings below. The district court didn't cite it. They didn't cite it in their opening brief to this court. It's something that they just come up with at the last minute, which I think is improper. And in that case, there was no user fee claim. The plaintiffs didn't raise it. They didn't brief it. They didn't cite Evansville. There is a CF reference to the Evansville standard in a footnote in dicta. And in that case, the state or the government, it was a municipal government, was the one providing the services. So again, you run into the Oregon waste problem even there. Now before you, since this is your only opportunity to argue, we have two, at least two amicus briefs by imposing institutions. Is there anything about their arguments that you think you'd like to respond to in particular? Um, no, Your Honor. I didn't, I didn't see anything in either of those briefs that required any Fine. It sometimes happens that they raise arguments that counsel themselves don't raise and maybe we should look at, but that's fine. Um, I, I didn't see anything that they had raised that had not already been raised that I think had any, any Thanks very much. Mr. Shah has reserved some time. Thank you, Your Honors. Um, let, let me just start with one quick factual point and then move to the legal, uh, legal points. Um, you had asked counsel whether Connecticut could use state market data if it had good state market data. The statute itself on its face, this is 22A631, it's at addendum page six, says market share information shall be based upon available national market share data. There is no room for the state under its statute, even if it were undisputed that their proxy is complete bunk. It does not correlate at all as our complaint alleges. They would have no discretion. They have to use that national data. It completely belies their claim. This is merely a proxy and they should be given deference. And what, and what about, um, material issues of fact? Sure, Your Honor. So, uh, on the user fee, on the extraterritoriality claim, I don't think there are material issues of facts. I think that should be decided as a matter of law. If you find it directly applies to out of state transactions, that can be decided as a matter of law. That's on the face of the statute. The user fee analysis isn't as applied in inquiry because that is whether the state is having an entity pay its fair share of the use of the program. We've certainly alleged enough facts on a 12B6. We say that we have zero products in the recycling stream and yet we're paying 20% of the recycling fees. And our market share is 50% higher nationally than it is in Connecticut. They make no response on the merits of the Evansville test. So I think at a minimum, if Evansville applies, the district court's reversal of the motion to dismiss has to be reversed. They haven't argued otherwise in their papers and it would make no sense for it not to be reversed if the user fee framework arrives. And we might win on summary judgment unless they can, based on every fact that we know, we've pled the complaint that it's nowhere in the universe of a fair approximation. They haven't disputed that. Maybe they would want some discovery and come up with some new arguments to dispute it, but they could do that on remand in the district court. Certainly the disposition from this court would be a reversal of the dismissal on the user fee claim and then for further proceedings. Your preferred decree from us would be a vacater, presumably in a remand to the district court, which would then permit you to proceed to discovery, right? If on the user fee framework, that's exactly right. On the extraterritoriality argument, if you accepted our extraterritoriality argument, I think everyone agrees that's a per se argument. So it would just be a reversal and entry of judgment in our case. What about the burden? The third prong or issue? The Pike argument, we think we're going to rest on our papers. We think this should either be an extraterritoriality or a user fee case. If it's not, this squarely fits in the user fee framework. And if I can say a couple of things . . . It doesn't require any findings of fact. The user fee framework, again, would. We've met our pleading obligation. They don't deny that. So on remand, if they want to come up with some merits defense, we could have proceedings on that. If they want to concede, then it could be a quick summary judgment. But yes, that could proceed. Now, on user fee, the state keeps saying that we haven't pointed to burdens on interstate commerce as opposed to an interstate entity. Well, first of all, every Commerce Clause case you see is brought by a burden on an interstate entity. That's how you burden interstate commerce. And the user fee test itself is the doctrine. That is, if a state is imposing on an interstate actor something, a manifestly disproportionate share, something that's not a fair approximation of its use of the facility supporting interstate commerce, that is the violation of the Commerce Clause. You don't then ask, after you've won under the Evansville test, oh, can you show some additional harm to interstate commerce? The other thing I would say, as to the harm on interstate commerce, even if you graft it on beyond Supreme Court precedent, some additional inquiry, it undisputably benefits those manufacturers who share, sell a disproportionately higher share of television in Connecticut than those that sell outside of Connecticut. So if you had, for example, an in-state manufacturer, they would come out way ahead. That is a burden on interstate commerce. That actually goes to the core of the Commerce Clause, nor do they have any response to the tax analogy. In their view, where's the burden on interstate commerce there, those transactions? Can I write, and help me understand if I'm misunderstanding, but if we accepted your argument that the user fee framework was appropriate here, its effect would be taking a lot of cases that are now within the PIPE framework, and a less demanding one, if I'm understanding correctly, and elevating them into a framework that has not really been the one they've traditionally been analyzed under. I mean, this seems to me core, you know, local state interest in health safety recycling. Your Honor, I think as a practical matter, there'd be virtually no cases that move from PIPE to... Why is that? That is because user fees are pretty rare in how local entities regulate. And when they actually... Most regulation is, you can't do this, you need a permit to do that. It's pretty rare that you have user fees imposed. Usually when a state regulates, it imposes a fee, it's a tax. There's a separate doctrine that deals with those. But if it actually is a user fee, like in USA Recycling, that this circuit has decided, usually those are waste disposal cases or transportation cases. Those are the only two contexts that we've seen something like a regulatory user fee that's not a tax come up. Those are in fact already analyzed as user fees. Now, a lot of them lose under the user fee framework on the merits because an entity can't show it's manifestly disproportionate. This is the rare case where we have the facts here to show that. So it's not going to create some sea change in the framework. In fact, we have not found a single case, and I've read a lot of them, where you've had a fee that is not either analyzed, a regulatory fee that is not either analyzed as a tax under the Commerce Clause tax cases or a user fee under Evansville. Not a single one. They haven't pointed to one. Thanks very much, Mr. Shah. Thank you, Your Honor. And opposing counsel, we appreciate the arguments of both. The case is submitted and we are adjourned.